IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| RICHARD TRACY, | ) |
| Plaintiff, | ) |
| | ) 2:20-CV-1960 |
| v. | ) |
| | ) |
| PNC BANK, N.A., | ) |
| | ) |
| Defendant. | ) |

## OPINION

**J. Nicholas Ranjan, United States District Judge**

Plaintiff Richard Tracy was closing on a house when he received fraudulent wiring instructions from the title company and inadvertently wired $143,585.59 to a scammer. He alerted his bank, Defendant PNC Bank, which then sought the return of the money from the scammer's bank, Truist Financial Corporation. Truist appeared to have recovered almost all of the funds—$141,763.20—and PNC Bank deposited that money into Mr. Tracy's account. Mr. Tracy then wired that money to close on the house.

But Truist had made an error and sent PNC Bank $70,200 more than it had actually recovered. PNC Bank froze $70,200 in Mr. Tracy's account as a "pending withdrawal" to potentially recoup that money for Truist, and informed Mr. Tracy that it was reviewing the matter. After about two months, PNC Bank permanently withdrew the $70,200, and returned that money to Truist. Based on this course of conduct, Mr. Tracy brought the present lawsuit against PNC Bank, alleging claims for breach of contract and, in the alternative, promissory estoppel.[1]

PNC Bank now moves for summary judgment, arguing that the undisputed material facts show that Mr. Tracy's claims are governed by his account-holder

---

[1] Mr. Tracy brought some additional claims, which the Court previously dismissed. *Tracy v. P.N.C. Bank, N.A.*, No. 20-1960, 2022 WL 2275493 (W.D. Pa. June 23, 2022) (Ranjan, J.).

agreement with PNC Bank, the terms of which expressly authorized its actions. PNC Bank contends that because of the existence of the account-holder agreement, the promissory-estoppel claim (which can only proceed as an alternative to a contract claim) must fail. Then, as to the contract itself, PNC Bank argues that the undisputed conduct in this case shows that there simply is no breach. On careful review, the Court agrees with PNC Bank and will grant its motion.

## BACKGROUND

In December 2019, Mr. Tracy instructed PNC Bank to wire $143,585.59 to close on a home. The transfer was intended for the seller's title company, but Mr. Tracy received fraudulent wiring instructions and unwittingly authorized the transfer to an unknown fraudster's bank account with Truist. On December 24, 2019, Mr. Tracy learned of the fraud and asked PNC Bank to "pull back the wire." ECF 77-4, p. 22:12-19. PNC Bank engaged Truist to try to recover the funds, and also warned Mr. Tracy that "some or all of the funds may already be gone." Ex. Z, p. 3 (PNC_TRACY_000114); *see also* Ex. Y, p. 2 (PNC_TRACY_000090).

On December 27, 2019, PNC Bank learned that Truist had recovered much of the funds ("around $100,000") and told Mr. Tracy that Truist hoped to return the funds within a week. Ex. Z, p. 4 (PNC_TRACY_000115). That same day, it formally requested that Truist "block access" to the misappropriated funds and "return $143,585.59 or the amount of funds still on deposit in [the scammer's] account, whichever is less." Ex. Z, p. 32-34 (PNC_TRACY_000143-45). With its request, PNC Bank sent a "Hold Harmless and Indemnity" agreement to Truist, in which PNC Bank agreed to indemnify Truist for any claims, liabilities, and losses that either

PNC Bank or Truist might sustain because of the return.  *Id.* at 34-35 (PNC_TRACY_000145-46).

On January 2, 2020, Truist returned $141,763.20 to PNC Bank (about $1,800 less than what Mr. Tracy originally sent), and PNC Bank deposited that money into Mr. Tracy's account.  ECF 77-2 (Ex. B), p. 3; ECF 77-4 (Ex. D), pp. 24:5-26:7; Ex. X, p. 40:19-22; Ex. Y, p. 5 (PNC_TRACY_000093).  Mr. Tracy made up the difference from a contribution from the closing company, which agreed to cover any shortfall up to $63,000.  ECF 77-4 (Ex. D), pp. 48:20-49:4.  Mr. Tracy then wired $141,763.20 to the closing company to close on the house.  ECF 77-2 (Ex. B), p. 3; ECF 77-4 (Ex. D), p. 25:12-21.  The matter seemed to be resolved at that point.

Unfortunately, Truist had made an error in returning Mr. Tracy's money by overdrawing $70,200 on the recovered funds.  Ex. Z, pp. 4 (PNC_TRACY_000115), 9-10 (PNC_TRACY_000120-21).  Pursuant to the indemnity agreement, Truist requested that PNC Bank "return[] the entire amount [Truist] paid to PNC" or "compensate[] [Truist] for the amount of its loss, $70,200.00."  *Id.* at 10 (PNC_TRACY_000121); ECF 77-10 (Ex. J).  PNC Bank placed a hold on $70,200 in Mr. Tracy's account in response.  ECF 77-4 (Ex. D), p. 25:22-25; Ex. X, p. 39:17-21.

Over the next two months, Mr. Tracy sought updates about the hold from PNC Bank's representatives, Carol Crain and Megan McKenzie, as PNC Bank's legal department reviewed the issue.  ECF 77-11 (Ex. K).  After much back-and-forth, on March 19, 2020, Ms. McKenzie informed Mr. Tracy that the bank had to return the $70,200 to Truist under the indemnity agreement.  *Id.* at 4 (PNC_TRACY_000091).  PNC Bank finally deducted the funds on March 31, 2020.  ECF 77-2 (Ex. B), p. 12 (PNC_TRACY_000054).  Even worse for Mr. Tracy, the closing company refused to

make up any difference (ECF 77-14 (Ex. N)), so Mr. Tracy had to draw on a 401(k) account to cover the $70,200. ECF 77-4 (Ex. D), pp. 69:18-70:18, 82:2-25.

Mr. Tracy sued PNC Bank in state court in November 2020, and following removal to this Court and dismissal of the complaint without prejudice, Mr. Tracy filed an amended complaint alleging breach of contract (Count I), promissory estoppel (Count II), violation of the Pennsylvania Unfair Trade Practices and Consumer Protection Law (Count III), and violation of the Pennsylvania Uniform Commercial Code (Count IV). ECF 20. PNC Bank then moved to dismiss the First Amended Complaint, and this Court granted the motion, in part. Specifically, the Court dismissed Count III on grounds that Mr. Tracy "did not purchase a relevant good or service from PNC Bank," such that the UTPCPL did not apply. *Tracy*, 2022 WL 2275493, at *4. The Court also dismissed Count IV because the UCC could only protect Mr. Tracy if the wire transfer to the scammer was "unauthorized," but here "Mr. Tracy himself authorized and instructed PNC Bank to initiate the wire." *Id.* at *5.

As to Count I (Breach of Contract), the Court found that Mr. Tracy failed to state a claim based on an "agreement concerning security measures" between himself and PNC Bank. *Id.* at *2. But he adequately stated a claim for breach of the duty of good faith and fair dealing based on PNC Bank's purported "stonewalling" of Mr. Tracy following the hold on the $70,200. *Id.* at *2-3. The Court also concluded that Count II (Promissory Estoppel) survived at the motion-to-dismiss stage, but that its viability depended on whether "a valid and enforceable contract controls[.]" *Id.* at *3.

Following fact discovery, PNC Bank now moves for summary judgment on the narrowed Count I and the alternative Count II (ECF 75).

## LEGAL STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). At summary judgment, the Court must ask whether the evidence presents "a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986). In making this determination, "all reasonable inferences from the record must be drawn in favor of the nonmoving party and the court may not weigh the evidence or assess credibility." *Goldenstein v. Repossessors, Inc.*, 815 F.3d 142, 146 (3d Cir. 2016) (cleaned up). The moving party bears the initial burden to show the absence of a genuine dispute of material fact, and "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party[,]" summary judgment is improper. *Id.* (citation omitted).

But if the non-moving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial[,]" summary judgment is warranted. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Summary judgment "is essentially 'put up or shut up' time for the non-moving party: the non-moving party must rebut the motion with facts in the record and cannot rest solely on assertions made in the pleadings, legal memoranda, or oral argument." *Berckeley Inv. Grp., Ltd. v. Colkitt*, 455 F.3d 195, 201 (3d Cir. 2006) (citation omitted).

## DISCUSSION & ANALYSIS

At the motion-to-dismiss stage, this Court found that Mr. Tracy had adequately stated a claim for breach of the duty of good faith and fair dealing implied in the account-holder agreement between Mr. Tracy and PNC Bank, and an alternative claim for promissory estoppel. *Tracy*, 2022 WL 2275493, at *3. In

reaching that conclusion, the Court was required to accept the amended complaint's well-pled facts as true and to draw all reasonable inferences in Mr. Tracy's favor. And as pled, the amended complaint adequately alleged that PNC "assured" Mr. Tracy that a "significant portion of the money would be recovered," credited the recovered $141,763.20 to Mr. Tracy's account "per its assurances," and then without warning or reason froze and withdrew $70,200. ECF 20, ¶¶ 34-42. Thus, Mr. Tracy presented "a fact-intensive and context-driven inquiry that the Court [could not] resolve on a motion to dismiss" and which required discovery. *Gottfredson v. Donnelly*, No. 21-471, 2021 WL 2784254, at \*2 (W.D. Pa. July 2, 2021) (Ranjan, J.).

New facts have since emerged. The record now reflects that PNC Bank owed legal obligations to Truist via the indemnity agreement that it sent to recover even a single dollar of Mr. Tracy's lost money. The record details Mr. Tracy's interactions with the two PNC Bank employees on his case, Carol Crain and Megan McKenzie, as well as Ms. Crain and Ms. McKenzie's interactions with the bank's legal department—none of which reflect the "stonewalling" and bad faith that were alluded to in the pleading stage. And most importantly, the record shows that the account-holder agreement governed PNC Bank's actions and that, per its terms, PNC Bank could freeze and deduct the recovered funds from Mr. Tracy's account.

The Court concludes that a contract exists here, so Mr. Tracy's promissory-estoppel claim in the alternative must fail. Further, upon review of the record, and drawing all reasonable inferences in Mr. Tracy's favor, the Court finds that Mr. Tracy

cannot create a genuine dispute that PNC Bank breached its implied duty of good faith and fair dealing.

**I.  Mr. Tracy's promissory-estoppel claim fails because the account-holder agreement governs.**

As explained in the motion-to-dismiss order, Mr. Tracy's promissory-estoppel claim stands or falls on the existence of a contract governing PNC Bank's conduct after the recovery of Mr. Tracy's money. *Tracy*, 2022 WL 2275493, at *3 (a promissory estoppel claim should be dismissed "after the Court definitively determines that a valid and enforceable contract controls"). The parties agree with this legal principle. ECF 76, pp. 8-10; ECF 81, p. 8. But Mr. Tracy insists no contract exists, while PNC Bank points to the account-holder agreement, "which expressly permitted PNC to 'freeze or place a hold on [Tracy's] account without setting off in order to investigate any dispute or claim.'" ECF 76, p. 15 (alteration original). The Court agrees with PNC Bank that the account-holder agreement governs the relationship between the parties.

By its plain terms, the account-holder agreement defines the relationship between Mr. Tracy and PNC Bank. ECF 77-6 (Ex. F), p. 3. Several provisions describe what PNC Bank could and couldn't do regarding deposits into and withdrawals from Mr. Tracy's account, including:

- "We reserve the right to make adjustments to your Account for computational or other errors related to your Account."

- "We reserve the right to refuse or return all or part of a deposit at any time. All deposits and credits to your account, including without limitation wire transfers and other electronic payments, are subject to review for compliance with applicable law, including without limitation regulations enforced by OFAC. This may result in delays in posting such

deposits or credits to your account, or refusal to accept all or part of the deposit. We will not be liable to you for any such delays or refusals. We will have no obligation to provide you with notice of any nonpayment, dishonor or protest regarding any items credited to or charged against your Account."

- "If we credit your Account for an ACH credit entry or for any other fund transfer or payment order ("fund transfer"), the credit we give you is provisional until we receive final settlement for the fund transfer through a Federal Reserve Bank. If we do not receive final settlement or payment, you agree that you must refund to us the amount we credited to you for the fund transfer, and that we may charge your Account for such amount."

- "Any loans, overdrafts, obligations or other indebtedness . . . now or hereafter owing to us by you . . . may be charged in whole or in part to the Account or to any other individual or joint accounts in your name to the extent permitted by law."

- "We may exercise our right of set off without advance notice to you and without regard to any other right that we may have against you or any other person or entity. We may also freeze or place a hold on your account without setting off in order to investigate any dispute or claim."

*Id.* at 4-5, 11.

The account-holder agreement authorized each action that PNC Bank took, as follows. PNC Bank placed a hold on the $70,200 to investigate Truist's demand based on its transferring more funds than it had recovered in the wire recall. *Id.* at 11 ("We may also freeze or place a hold on your account without setting off in order to investigate any dispute or claim"). It then investigated the issue over about two

months. *Id.* PNC Bank ultimately determined that its indemnity agreement with Truist required it to return the $70,200. *Id.* at 4 ("All deposits and credits to your account, including without limitation wire transfers and other electronic payments, are subject to review for compliance with applicable law[.]"). The account-holder agreement warned that such a review may result in delays. *Id.* ("This may result in delays in posting such deposits or credits to your account, or refusal to accept all or part of the deposit. We will not be liable to you for any such delays or refusals."). Per that agreement, PNC Bank drew on Mr. Tracy's account to return Truist's money. *Id.* ("We reserve the right to refuse or return all or part of a deposit at any time."); *id.* at 11 ("Any loans, overdrafts, obligations or other indebtedness . . . now or hereafter owing to us by you . . . may be charged in whole or in part to the Account[.]").

Despite these provisions, Mr. Tracy argues that the account-holder agreement doesn't apply because it doesn't "speak to the issue at hand regarding fraudulent wire transfers or the consideration of [PNC Bank] to protect Mr. Tracy's assets" from fraud "or the course of action [PNC Bank] would take" following fraud. ECF 81, pp. 8-9. The problem with this argument is that "the issue at hand" doesn't concern the fraudulent transfers or PNC Bank's anti-fraud measures.

After the Court's ruling at the motion-to-dismiss stage, the claims in this case were narrowed to "PNC Bank's conduct towards Mr. Tracy after the attempted cancellation/retrieval of the wire transfer." *Tracy*, 2022 WL 2275493, at *3 n.4. Thus, PNC's pre-wire fraud-detection procedures and obligations are not at issue at summary judgment. *See Prime Energy & Chem., LLC v. Tucker Arensberg, P.C.*, No. 18-345, 2019 WL 3778756, at *6 (W.D. Pa. Aug. 12, 2019) (Yane, J.) ("The doctrine of

the law of the case precludes review of legal issues previously decided." (citations omitted)).

But even if they were, Mr. Tracy doesn't explain how they form the basis for his promissory-estoppel claim. To succeed on that claim, he must establish a promise that PNC Bank made to him and reliance on that promise. *Luther v. Kia Motors Am., Inc.*, 676 F. Supp. 2d 408, 421 (W.D. Pa. 2009) (Standish, J.). But the record is devoid of any written or spoken policies, disclosures, assurances, or disclaimers that PNC Bank made to Mr. Tracy about what it would do to address a fraudulent wire transfer or recover his money.

Mr. Tracy also fails to demonstrate that he relied on any assurances. At best, he opaquely cites to something called "Positive Pay Solutions" as having induced his reliance. ECF 81, p. 9. But, as PNC rightly points out, Mr. Tracy "does not explain what Positive Pay is, why it is relevant, or when that promise was made, and it is unmentioned in the Amended Complaint." ECF 84, p. 5. Given the absence of any record evidence on this point, there is no basis for the claim to proceed. *NVR, Inc. v. Majestic Hills, LLC*, No. 18-1335, 2023 WL 3043780, at *3 (W.D. Pa. Apr. 21, 2023) (Ranjan, J.) ("Summary judgment is essentially 'put up or shut up' time for the non-moving party." (cleaned up)).

Because a contract governing the relevant conduct (*i.e.*, PNC's later withdrawal of the $70,200) exists, there cannot be a promissory-estoppel claim arising from the same matters governed by the contract. So the Court must dismiss it.

## II. PNC Bank did not breach its implied duty of good faith.[2]

If Mr. Tracy has a claim, it must be based in the terms of his contract, and so the Court must look to the account-holder agreement to determine whether PNC

---

[2] The account-holder agreement states, "This Agreement is governed by the laws and regulations of the state in which the branch or retail office where you opened your

Bank breached any duty to Mr. Tracy. After the Court's decision at the motion-to-dismiss stage, the only duty at issue is the implied duty of good faith arising out of PNC Bank's conduct in recouping the funds. As discussed below, the Court concludes that Mr. Tracy cannot raise a genuine dispute of fact that PNC Bank breached that implied duty.

"Every contract imposes on each party a duty of good faith and fair dealing in its performance and its enforcement." *Tracy*, 2022 WL 2275493, at *2 (cleaned up). This claim is, in essence, one for breach of contract, so to succeed, Mr. Tracy must show "(1) the existence of a contract with [PNC Bank], (2) a breach of the duties imposed by the covenant of good faith and fair dealing implied in that contract, and (3) damages arising from the breach of the contractual duties." *Walkup v. Santander Bank, N.A.*, 147 F. Supp. 3d 349, 363 (E.D. Pa. 2015).[3]

The scope of the duty of good faith arises from the terms of the contract itself—in other words, the duty of good faith "must always be grounded in a specific provision of a contract." *Nationwide Ins. Indep. Contrs. Ass'n v. Nationwide Mut. Ins. Co.*, 518 F. App'x 58, 62 (3d Cir. 2013). A violation "can include evasion of the spirit of the

---

Account is located, without regard to such state's choice of law or conflict of law principles." ECF 77-6 (Ex. F), p. 13. The parties' briefs presume that Pennsylvania law applies, but if Mr. Tracy opened the account while he was in California, then California law would apply. The Court has reviewed the law of both States pertaining to the implied duty of good faith and finds that Pennsylvania and California law align, so it is immaterial which law applies.

[3] California law likewise "recognizes in every contract an implied covenant of good faith and fair dealing." *Trishan Air, Inc. v. Fed. Ins. Co.*, 635 F.3d 422, 434 (9th Cir. 2011) (cleaned up). To succeed, the plaintiff must show "(1) the parties entered into a contract; (2) the plaintiff fulfilled his or her obligations under the contract; (3) the defendant unfairly interfered with the plaintiff's rights to receive the benefits of the contract; and (4) the plaintiff was harmed by the defendant's conduct." *Pemberton v. Nationstar Mortg. LLC*, 331 F. Supp. 3d 1018, 1041 (S.D. Cal. 2018). Breach "is limited to assuring compliance with the express terms of the contract, and cannot be extended to create obligations not contemplated in the contract." *Ramirez v. Bank of Am., N.A.*, 607 F. Supp. 3d 969, 976 (N.D. Cal. 2022) (cleaned up).

bargain, lack of diligence and slacking off, willful rendering of imperfect performance, abuse of a power to specify terms, and interference with or failure to cooperate in the other party's performance." *Tracy*, 2022 WL 2275493, at *2 (cleaned up).

Applying these principles and viewing the evidence in the light most favorable to Mr. Tracy, the Court concludes that PNC Bank did not breach its implied duty of good faith for the conduct at issue. That's because the account-holder agreement gave PNC Bank the right and discretion to freeze and withdraw the disputed $70,200 after an investigation. ECF 77-6 (Ex. F). The agreement even warned Mr. Tracy that an investigation might result in delays and that PNC was not liable for any damages resulting from such delays. *Id.* at 4 ("All deposits . . . are subject to review for compliance with applicable law[,]" which "may result in delays" for which PNC Bank "will not be liable").

Mr. Tracy makes two arguments to support breach, but both come up short. First, he insists that PNC Bank breached its duty of good faith by "never provid[ing] Mr. Tracy with a definitive answer to his questions and concerns" regarding the hold on the $70,200 until it was withdrawn. ECF 81, p. 11. It is true that PNC Bank took some time to finally resolve the hold, but the undisputed evidence doesn't show that PNC Bank acted in bad faith or did anything that would rise to the level of violating the spirit of the agreement.

Specifically, the call logs reflect that PNC Bank fielded each call from Mr. Tracy and did not avoid him. ECF 77-11 (Ex. K). PNC Bank's representatives also explained to Mr. Tracy that its legal department was looking into the issue when he called. *Id.* The legal department promptly began reviewing Mr. Tracy's case on January 14, 2020. Ex. Z, p. 13 (PNC_TRACY_000124). PNC Bank's agents then sought updates from the legal department throughout the two-month period. *E.g.*, Ex. Y, pp. 3-4 (PNC_TRACY_000091-2) (February 10, 2020, log note stating PNC

Bank would request that legal expedite its review of Mr. Tracy's issue; February 13, 2020, log note specifically requesting update from legal); Ex. Z, p. 19 (PNC_TRACY_000130) (March 12, 2020, email asking if agent got "a response back from legal yet"). While PNC Bank's delay was no doubt frustrating to Mr. Tracy, he cannot show that the delay was an attempt by PNC Bank to avoid fulfilling any obligations under the account-holder agreement. In fact, the contract expressly contemplated that such delays might happen—but that PNC Bank would not be liable for any resulting harm. ECF 77-6 (Ex. F), p. 4 ("This may result in delays in posting such deposits or credits to your account, or refusal to accept all or part of the deposit. We will not be liable to you for any such delays or refusals.").[4]

In his second argument, Mr. Tracy says that PNC Bank should have used "its Fraud Mitigation Solutions to catch . . . fraudulent occurrences prior to them happening" and "should have been aware that the wire transfer number Mr. Tracy provided . . . did not match with the bank to which the transfer was supposed to be received." ECF 81, pp. 11-12. In essence, he argues that PNC should have stopped the fraud before the transfer occurred. Again, as noted above, the Court already dismissed this line of reasoning at the motion-to-dismiss stage. *Tracy*, 2022 WL 2275493, at *3 n.4.

In the end, the Court is sympathetic to Mr. Tracy. He was the victim of a fraud, but PNC Bank wasn't the fraudster, the fraudster's bank, or the compromised title company. Its role here was limited, and those limitations were set forth in the

---

[4] Mr. Tracy relies on a portion of the deposition testimony of Ms. McKenzie, who was one of the PNC Bank employees with whom he was communicating. He argues that Ms. McKenzie suspected that PNC ultimately would withdraw the $70,200 from his account, but nonetheless did not tell him. ECF 81, pp. 5-6. Ms. McKenzie's suspicion is not material. From this record, it is undisputed that PNC Bank's legal department had ultimate say on the issue, and nothing in the record suggests that the legal department had reached a decision prior to mid-March 2020. *See* ECF 85-1 (Ex. BB), p. 47:2-5.

account-holder agreement with its customer. Because PNC Bank acted consistently with its account-holder agreement in attempting to assist Mr. Tracy in recovering his money, summary judgment is appropriate.

## **CONCLUSION**

For the reasons above, the Court will grant PNC Bank's motion for summary judgment as to Count I (Breach of Contract) and Count II (Promissory Estoppel), which are the remaining claims in the amended complaint. An appropriate judgment order follows.

DATED this 16th day of February, 2024.

BY THE COURT:

/s/ *J. Nicholas Ranjan*
United States District Judge